## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## CASE NO.

BARBARA BRUSH, individually and
on behalf of all others similarly situated,

     *Plaintiff,*

*v.*

MIAMI BEACH HEALTHCARE GROUP, LTD.
d/b/a AVENTURA HOSPITAL AND
MEDICAL CENTER, a Florida limited partnership,
and HCA-EMCARE HOLDINGS, LLC
d/b/a VALESCO VENTURES,
a Delaware limited liability company,

     *Defendants.*

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Barbara Brush brings this Class Action Complaint and Demand for Jury Trial against Defendants Miami Beach Healthcare Group, Ltd. d/b/a Aventura Hospital and Medical Center ("Miami Beach Healthcare") and HCA-EmCare Holdings, LLC d/b/a Valesco Ventures ("Valesco") (collectively, "Defendants") and alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.    Plaintiff brings this class action lawsuit against Defendants because of (i) their failure to safeguard their patients' sensitive personal information, including their names, dates of birth, Social Security numbers ("SSNs"), and protected health information as defined by the Health Insurance Portability and Accountability Act ("HIPAA") (collectively, "Sensitive Information"),

and (ii) the harm flowing from such conduct, including the serious instances of identity theft and other data misuse that happened as a result.

2.     Defendant Miami Beach Healthcare is part of a highly integrated non-governmental, for-profit healthcare delivery system, which owns and/or manages healthcare centers throughout Florida, including the Aventura Hospital and Medical Center facilities, located in the State of Florida. Miami Beach Healthcare, together with Defendant Valesco, jointly work together to provide healthcare-related services to patients at Aventura Hospital and Medical Center.

3.     As healthcare providers, Defendants are required to protect their patients' Sensitive Information by adopting and implementing the specific data security regulations and standards set forth under HIPAA and Fla. Stat. Ann. § 395.3025(4). Many of these same data protection practices are mandated by industry standard data protection protocols.

4.     In addition to their implied statutory obligations, Defendants—through Aventura Hospital and Medical Center's privacy policies and patient agreements—specifically promised and, through its conduct, assumed a duty to protect patients' Sensitive Information by adopting and implementing the specific data security regulations and standards set forth under HIPAA and Fla. Stat. Ann. § 395.3025(4).

5.     Defendants' promises and assumed duties are incredibly important to their patients, especially because (i) the data entrusted to Defendants is regularly targeted by criminals and other individuals looking to exploit it, and (ii) the repercussions of the unauthorized access and misuse of Sensitive Information is both severe and long-lasting.

6.      Because Defendants expect and require their patients to pay for all the services they receive—including health and data security services—a portion of the fees that Defendants receive (directly or indirectly) is allocated to implementing data security practices.

7.      Unfortunately, it took a large-scale medical data breach to reveal—*for the third time*—that Defendants failed to provide their patients' with the level of data protection that they promised and paid for.

8.      Indeed, in September 2014, Defendants informed their patients that a hospital employee had been accessing—without authorization—the Sensitive Information of Aventura Hospital patients for nearly *two years*. Specifically, between September 13, 2012 and June 9, 2014, an employee was able to easily gain access to the Sensitive Information of thousands of Aventura Hospital patients—even though the individual was not authorized to access such information, was presumably supervised in some capacity, and access to such information had nothing to do with his or her job responsibilities and duties.

9.      While some security threats are unavoidable in a rapidly developing technological environment (and, indeed, underscore the need for modern and robust information security protections), Defendants' failure to, among other things, segment and control their databases in accordance with long standing HIPAA security regulations, Fla. Stat. Ann. § 395.3025(4), and industry standard data protection protocols jeopardized their patients' Sensitive Information, and fell well short of the paid-for promises made through Aventura Hospital's patient agreements and privacy policies.

10.     And while Defendants' conduct harmed each and every one of their paying patients (including by exposing them all to an increased risk of data misuse), it also specifically caused certain of their patients—including Plaintiff Brush—to suffer actual identity theft.

3

11.     Ultimately, Plaintiff paid (or caused to be paid) Defendants for data protection services that were never provided. Accordingly, Plaintiff brings suit on behalf of herself and all others similarly situated, to recover the monies unjustly retained by Defendants, to recover for her identity theft injuries and expenses that were caused by Defendants' failure to safeguard her Sensitive Information, and to otherwise seek redress for their unlawful conduct.

## PARTIES

12.     Plaintiff Barbara Brush is a natural person and resident of the State of Florida.

13.     Defendant Miami Beach Healthcare Group, Ltd. d/b/a Aventura Hospital and Medical Center is a limited partnership existing under the laws of the State of Florida, with its principal place of business at One Park Plaza, Nashville, Tennessee 37203. Miami Beach Healthcare is also registered to conduct business in the State of Florida (as entity number A31526). Miami Beach Healthcare conducts business throughout this District, the State of Florida, and the United States.

14.     Defendant HCA-EmCare Holdings, LLC d/b/a Valesco Ventures is a limited liability company existing under the laws of the State of Delaware with its principal place of business located at 6200 South Syracuse Way, Suite 200, Greenwood Village, Colorado 80111. Valesco is also registered to conduct business in the State of Florida (as entity number M13000007938 and G15000011420). Valesco conducts business throughout this District, the State of Florida, and the United States.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Classes is a citizen of a state different

from Defendants, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

16.     This Court has personal jurisdiction over Defendants because they are registered to and actually do conduct business in this District, operate hospitals and other facilities located in this District, and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated, in part, from this District.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District, and because the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated, in part, from this District. Venue is additionally proper because Defendants operate hospitals and other administrative offices in this District.

## FACTUAL BACKGROUND

*Defendants' Privacy Statements and Agreements Promise to Keep Patients' Sensitive Information Confidential*

18.     Through their Notice of Privacy Practices (which all patients receive upon admission to their hospitals and facilities, and is generally available on Defendants' websites), Defendants represented that they would protect their patients' Sensitive Information and keep it confidential. For instance, the Notice of Privacy Practices stated in relevant part:[1]

> "Each time you visit a hospital, physician, or other healthcare provider, a record of your visit is made. Typically, this record contains your symptoms, examination and test results, diagnoses, treatment, a plan for future care or treatment, and billing-related information. This notice applies to all of the records of your care generated by the facility, whether made by facility personnel, agents of the facility, or your personal doctor . . . ."

\*          \*          \*

---

[1]     *See Aventura Hospital and Medical Center's Notice of Privacy Practices*, http://aventurahospital.com/about/privacy-notice.dot (last visited Sept. 17, 2014).

"We are required by law to maintain the privacy of [such] health information, provide you a description of our privacy practices, and to notify you following a breach of unsecured protected health information. We will abide by the terms of this notice . . . . Other uses and disclosures of health information not covered by this notice or the laws that apply to us will be made only with your written authorization."

19.     Similarly in Aventura Hospital's Patient Rights and Responsibilities and Patient Visitation Rights, it asserts the following:

Patients shall have their "medical records, including all computerized medical information, kept confidential . . . ."[2]

20.     Defendants' statements about their data security and management practices—both through their privacy policies and public representations—set forth specific services that its patients reasonably expected to receive. Without such statements and expectations, patients would not have sought care at Defendants' hospitals (especially at the price charged).

***The Data Breach Revealed For The Third Time That Defendants' Failed to Protect their Patients' Sensitive Information as Promised***

21.     As previewed above, Defendants accepted and then digitally stored patients' Sensitive Information on a commercial database on their servers, and promised—through Aventura Hospital's patient agreements and privacy policies—to protect such information using the standards set forth by law, including under HIPAA, Fla. Stat. Ann. § 395.3025(4), and in accordance with industry standards.

22.     In September 2014, Defendants announced that—for the *third time* in the past several years—Aventura Hospital's patient data had been compromised. Specifically, Defendants informed patients that, beginning in September 2012, an employee began to continuously and

---

[2]     *See Aventura Hospital and Medical Center's Patient Rights and Responsibilities and Patient Visitation Rights*, http://aventurahospital.com/patients/patient-rights-and-responsibilities-and-patient-visitation-rights.dot (last visited Sept. 17, 2014).

systematically use their databases to access and remove tens of thousands of their patients' Sensitive Information.

23.     The excessive and unauthorized access of patients' Sensitive Information by the Aventura Hospital employee went uncorrected for *two consecutive years*.

24.     Incredibly, and thanks to Defendants' wholly inadequate policies concerning the handling and security of their patients' Sensitive Information (including the oversight of those employees with access to such information), an employee—without authorization—was able to access over 85,000 patient records during that period.

***Defendants Violated HIPAA, Florida Law, and Industry Standard Data Protection Protocols***

25.     HIPAA was enacted and became effective in 1996.

26.     Title II of HIPAA contains what are known as the Administrative Simplification provisions, 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Sensitive Information, like the data left unguarded by Defendants. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

27.     Additionally, Section 395.3025 of the Florida Statutes states that "Patient records are confidential and must not be disclosed without the consent of the patient or his or her legal representative," save for limited exceptions not applicable here. Fla. Stat. Ann. § 395.3025(4).

28.     Defendants' data breach resulted from a combination of insufficiencies—especially pertaining to Defendants' data security relating to their patients' Sensitive Information—that indicate Defendants did not comply with safeguards mandated by HIPAA regulations, Florida law,

or industry standards. That is, Defendants either failed to implement sufficient information security policies and procedures to (1) protect (*e.g.*, via encryption) or otherwise safeguard their patients' electronically-stored Sensitive Information; (2) restrict access (*i.e.*, segment) their electronic database to limit access to such Sensitive Information to only those employees and personnel that need to access such information for treatment related reasons; and (3) supervise employees and personnel with access to patient Sensitive Information and enforce their data protection and confidentiality policies.

29.     In addition, Defendants' prolonged data breach could have been prevented if Defendants had honored their obligations to their patients by implementing even basic industry standard policies and procedures for securely maintaining Sensitive Information and ensuring only limited and appropriate access to such information.

30.     Contributing to the problem was Defendants' failure to effectively supervise and train their employees who were in charge of viewing, accessing, or otherwise supervising the use of the Sensitive Information of their patients.

31.     Defendants' security failures also include, but are not limited to, the following:

   a.     Failing to maintain an adequate data security system to prevent unauthorized access to Sensitive Information;

   b.     Failing to mitigate the risks of a data breach and unauthorized access to Sensitive Information;

   c.     Failing to encrypt or otherwise protect Sensitive Information of Plaintiff and Classes;

d.     Failing to ensure the confidentiality and integrity of electronic protected health information they created, received, maintained, and transmitted in violation of 45 CFR 164.306(a)(1);

e.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

f.     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

g.     Failing to identify and respond to suspected or known security incidents, and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR 164.308(a)(6)(ii);

h.     Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR 164.306(a)(2);

i.     Failing to protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR 164.306(a)(3);

j.     Failing to ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 CFR 164.306(a)(4);

k.      Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR 164.502, *et seq.*;

l.      Failing to effectively train all members of their workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 CFR 164.530(b) and 45 CFR 164.308(a)(5);

m.      Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 CFR 164.530(c); and

n.      Failing to ensure that their patients' medical records remain confidential and are not disclosed without consent of the patient or his or her legal representative, in violation of Fla. Stat. Ann. § 395.3025(4).

32.     Defendants also failed to comply with industry standards relating to data security. For example, the National Institute of Standards and Technology ("NIST") published a report detailing standards for healthcare providers to come into compliance with HIPAA's Security Rule. In the Report, NIST recommends specific techniques to safeguard electronically stored Sensitive Information. In one example, NIST specifically recommends that providers "Implement Policies and Procedures for Authorizing Access" which includes "implement[ing] policies and procedures

that . . . document, review, and modify a user's right of access to a workstation, transaction, program, or process."[3]

33.     In another example, NIST also discussed means for establishing "Workstation Security" which included "Document[ing] the different ways workstations are accessed by employees and nonemployees," as well as how to maintain proper "Access Control" by determining, *inter alia*, how users access and use information and how much information they should be permitted to access at any given time.[4]

34.     The foregoing examples illustrate Defendants' failure to comply with even basic industry standards. Even more striking is that one of the exact examples recommended by NIST (*i.e.*, monitoring and limiting access to Sensitive Information, a free and commonly used technique), would have prevented the unauthorized, at-issue access of patients' Sensitive Information at Defendants' facilities.

35.     Even though Defendants' patients both expected and paid for the above-described security measures as a part of their healthcare-related experience (*i.e.*, that the practices mandated by HIPAA, Florida law, and industry standards would be used to protect their Sensitive Information), they were not implemented, which resulted in the unauthorized access and misuse of their Sensitive Information.

---

[3]     Matthew Scholl, et al., National Institute of Standards and Technology, U.S. Dep't of Commerce. NIST Special Publication 800-66 Revision 1, *An Introductory Resource Guide for Implementing the Health Insurance Portability and Accountability Act Security Rule*, at 23 (2008), http://csrc.nist.gov/publications/nistpubs/800-66-Rev1/SP-800-66-Revision1.pdf.

[4]     *Id.* at 38, 40.

*Defendants' Practices Exposed Their Patients' Sensitive Information to Potential—and Actual—Misuse*

36.     Defendants' above-described failures to protect their patients' Sensitive Information increased the risk that all of their patients will suffer identity theft (or other harms stemming from the misuse of their data), and in fact caused them to experience actual instances of identity theft.

37.     These results are hardly surprising. As the United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report"), identity thieves use identifying data such as SSNs to open financial accounts, receive government benefits and incur charges and credit in a person's name.[5] As the GAO Report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

38.     In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[6]

39.     According to the Federal Trade Commission ("FTC"), identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[7] Identity thieves use stolen personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[8]

---

[5]     See United States Government Accountability Office, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), available at http://www.gao.gov/new.items/d07737.pdf.

[6]     Id.

[7]     *See* Federal Trade Commission, *Identity Theft*, http://www.consumer.ftc.gov/features/feature-0014-identity-theft (last visited April 18, 16).

[8]     The FTC defines identity theft as "a fraud committed or attempted using the identifying

40.     With access to an individual's Sensitive Information, criminals can do more than just empty a victim's bank account—they can also commit various types of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information (like what happened to Plaintiff Brush). In addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.[9] Further, loss of private and personal health information can expose the victim to loss of reputation, loss of job employment, blackmail and other negative effects.

41.     Sensitive Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, SSNs, and other Sensitive Information directly on various Internet websites making the information publicly available. In one study, researchers found hundreds of websites displaying stolen Sensitive Information. The study concluded:

> It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet. They

---

information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

[9]     *See*     Federal     Trade     Commission,     *Identity     Theft*, http://www.consumer.ftc.gov/features/feature-0014-identity-theft (last visited April 18, 16).

are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements. It seems that the black market for cyber criminals is not underground at all. In fact, it's very "in your face."[10]

42.     A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[11] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[12] Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.

Further, medical databases are particularly high value targets for identity thieves. According to a 2012 National Insurance report, "[a] stolen medical identity has a $50 street value – whereas a stolen social security number, on the other hand, only sells for $1."[13] In fact, the medical industry has experienced disproportionally higher instances of computer theft than any other industry.

***Plaintiff Brush's Experience***

43.     In October 2008, Brush was admitted as a patient to Defendants' Aventura Hospital and Medical Center facilities in Florida.

---

[10]     *See The Underground Credit Card Blackmarket*, StopTheHacker, http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/ (last visited April 18, 16).

[11]     *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), http://news.cnet.com/8301-27080_3-10460902-245.html (last visited April 18, 16).

[12]     Id.

[13]     *See Study: Few Aware of Medical Identity Theft Risk*, Claims Journal, http://www.claimsjournal.com/news/national/2012/06/14/208510.htm (last visited April 18, 16).

44.     As part of the patient-admission process, Brush was required to provide Defendants with her Sensitive Information and agreed to receive and pay for services related to her healthcare. In return, Defendants promised and otherwise accepted a duty to provide healthcare services and protect Brush's Sensitive Information in accordance with HIPAA, Fla. Stat. Ann. § 395.3025(4), and industry standards.

45.     Consistent with her agreement to pay, Defendants charged Brush for the services she received. That bill held Brush personally liable for $183.60, which she paid directly to Defendants.

46.     Had Brush known of Defendants' inadequate security procedures and methods of protecting and storing her Sensitive Information, she would only have agreed to pay substantially less for Defendants' services, would have disputed her payment with the hospital, or would have sought care elsewhere.

47.     However, Brush could not have known about Defendants' failure to safeguard her Sensitive Information before Defendants announced in September 2014 that Aventura Hospital data's patient databases had been accessed without authorization. Before this time, Brush reasonably believed that Defendants had provided her with all the services—including data protection services—that she previously paid for.

48.     But because Defendants did not sufficiently protect her Sensitive Information, Brush did not receive the entirety of the services she paid for and, as a result, she paid for data protection services that she didn't receive.

49.     The records accessed and viewed by Defendants' employee without authorization included Plaintiff's Sensitive Information.

50.     Brush's Sensitive Information was thereafter disclosed to or sold to a third party by Defendants' employee. This third party subsequently used that information to steal her identity and file a fraudulent tax return using her name and Social Security number.

51.     After learning that her identity was stolen, Plaintiff Brush spent (and continues to spend) a substantial amount of time and resources fixing the identity theft that she experienced and mitigating against the on-going harmful effects of the data breach.

52.     Prior to her visit to Defendants' Aventura Hospital and Medical Center facilities in Florida, Brush's identity had never been stolen.

53.     Indeed, prior to the data breach, Brush took considerable precautions to protect her Sensitive Information. Brush avoids transmitting her Sensitive Information over insecure sources, she stores documents containing Sensitive Information in a safe and secure location, and she destroys any documents that she receives in the mail that contain any of her Sensitive Information or that contain any information that could otherwise be used to steal her identity.

54.     However, as explained above, Plaintiff Brush has experienced—for the first time— instances of identity theft, which were caused directly by Defendants' failure to protect her Sensitive Information.

55.     Thus, given that before the data breach Brush had never previously suffered from identity theft and undertook considerable efforts to protect her Sensitive Information, Brush has sufficiently shown that the data breach caused her instances of identity theft.

56.     In short, but for Defendants' data breach, Brush's identity would not have been stolen, her Sensitive Information would not have been used to file a fraudulent tax return purportedly on her behalf, and she would not have to continue to spend time and resources to mitigate against the harmful effects of the data breach.

57.     Additionally, because Defendants did not sufficiently protect her Sensitive Information, Brush did not receive the entirety of the services she paid for and, as a result, she paid more than she otherwise would have.

## CLASS ALLEGATIONS

58.     **Class Definitions**: Plaintiff Brush brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (3) on behalf of herself and two classes of similarly situated individuals, defined as follows:

> **Overpayment Class**: All individuals in the United States who paid money to Defendants in exchange for healthcare services at Aventura Hospital and Medical Center facilities, and whose Sensitive Information was accessed without authorization by Defendants' employee(s).
>
> **Identity Theft Class**: All individuals whose Sensitive Information was misused as a result of Defendants' data breach.

Excluded from the Overpayment Class and Identity Theft Class (collectively, the "Classes") are (i) any judge presiding over this action and members of their families; (ii) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Classes; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendants' counsel; and (vi) the legal representatives, successors or assigns of any such excluded persons, as well as any individual who contributed to the unauthorized access of Defendants' patient records.

59.     **Numerosity**: The exact number of members of the Classes is unknown to Plaintiff at this time, but on information and belief, there are tens of thousands of members of the Classes

throughout the country, making joinder of each individual member impracticable. Ultimately, the members of the Classes will be easily identified through Defendants' records.

60.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members, and include, but are not limited to:

a.    Whether Defendants adequately safeguarded Plaintiff's and the Classes' Sensitive Information;

b.    Whether Defendants had a duty to safeguard Plaintiff's and the Classes' Sensitive Information, and the nature of that duty;

c.    Whether Defendants were negligent in storing and protecting Plaintiff's and the Identity Theft Class members' Sensitive Information;

d.    Whether Defendants should be liable for damages incurred by Plaintiff and the Classes as a result of their data breach;

e.    Whether express or implied contracts existed between Defendants, on the one hand, and Plaintiff and the members of the Classes on the other;

f.    Whether Defendants breached their contracts with Plaintiff and members of the Classes; and

g.    Whether Defendants should be permitted to retain the monies paid by Plaintiff and members of the Overpayment Class to protect their Sensitive Information.

61.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Classes. Plaintiff and the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Classes.

18

62. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

63. **Policies Generally Applicable to the Classes**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply and affect members of the Classes uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff or any other member of the Classes.

64. **Superiority**: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The damages suffered by the individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision

19

by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## **FIRST CAUSE OF ACTION**
### **Negligence**
### **(On Behalf of Plaintiff and the Identity Theft Class)**

65.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66.     Defendants requested and came into possession of the Plaintiff's and the Identity Theft Class's Sensitive Information, and had a duty to exercise reasonable care in safeguarding and protecting such information from being accessed. Defendants' duty arose from the legal and industry standards discussed above, from the circumstances under which it accepted Plaintiff's and the Identity Theft Class's Sensitive Information, and from their own acceptance of Plaintiff's and the Identity Theft Class's Sensitive Information.

67.     Defendants had a duty to employ procedures to detect and prevent the improper access and misuse of the Plaintiff's and the Identity Theft Class's Sensitive Information. The breach of security, unauthorized access, and resulting injury to Plaintiff and the Identity Theft Class were reasonably foreseeable, particularly in light of Defendants' various commitments to protect Plaintiff's and other Identity Theft Class members' Sensitive Information, their inadequate data security protocols, and the repeated data breaches impacting their own systems.

68.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and the Identity Theft Class by failing to implement industry-standard data security protocols and exercise reasonable care in protecting and safeguarding Plaintiff's and the Identity Theft Class members' Sensitive Information within Defendants' control.

69.     Defendants, through their actions and/or omissions, breached their duty to Plaintiff and the Identity Theft Class by failing to have procedures in place to detect and prevent access to Plaintiff's and the Identity Theft Class's Sensitive Information by unauthorized persons.

70.     But for Defendants' breaches of their duty, Plaintiff's and the Identity Theft Class's Sensitive Information would not have been compromised. Plaintiff's and the Identity Theft Class's Sensitive Information was stolen and accessed as the proximate result of Defendants failing to exercise reasonable care in safeguarding such information by adopting, implementing, and maintaining appropriate security measures.

71.     As a result of Defendants' conduct, Plaintiff and the Identity Theft Class have suffered actual identity theft. Accordingly, Plaintiff and the Identity Theft Class suffered and will continue to suffer actual damages including, but not limited to, expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; and increased risk of future harm.

72.     Further, Plaintiff and the Identity Theft Class have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**SECOND CAUSE OF ACTION**
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Classes)**

73.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

74.     Plaintiff and the Classes entered into valid and enforceable agreements with Defendants whereby they promised to provide healthcare and data protection services to Plaintiff

and the Classes, and Plaintiff and the Classes agreed to, among other things, pay money for such services.

75.     Both aspects of Plaintiff's and the Classes' agreements with Defendants (*i.e.*, the provision of healthcare and data protection services) were material.

76.     In Aventura Hospital's patient agreements and privacy policies (which formed the underlying contract between Defendants and their patients), Defendants expressly promised Plaintiff and members of the Classes that Defendants only disclose health information when required to do so by federal or state law.

77.     Defendants likewise promised to protect Plaintiff's and the Classes' Sensitive Information.

78.     The contracts required that Defendants not disclose Plaintiff's and the Classes' Sensitive Information to unauthorized third parties, and to safeguard the information from being lost and/or accessed without authorization.

79.     As described throughout this Complaint, Defendants did not safeguard Plaintiff's and the Classes' Sensitive Information.

80.     The failure to protect Plaintiff's and the Classes' Sensitive Information as expressly promised constitutes a breach of express contract.

81.     Because Defendants allowed unauthorized access to Plaintiff's and the Classes' Sensitive Information and failed to safeguard it as promised, Defendants breached their contracts with Plaintiff and members of the Classes.

82.     A meeting of the minds occurred, as Plaintiff and members of the Classes agreed to, among other things, provide Defendants with accurate and complete information about present complaints, past illnesses, prior hospitalizations, medications and other matters related to their

health and to pay Defendants in exchange for Defendants' agreement to, among other things, protect their Sensitive Information.

83.     Defendants breached their contracts with Plaintiff and the members of the Classes by failing to implement sufficient security measures to protect Plaintiff's and the Classes' Sensitive Information as described herein.

84.     This failure to meet their confidentiality and privacy obligations resulted in Plaintiff and the Classes receiving less than what they bargained for and were entitled to.

85.     Stated otherwise, because Plaintiff and the Overpayment Class paid for privacy protections that they did not receive—even though such protections were a material part of their contracts with Defendants—Plaintiff and the Overpayment Class did not receive the full benefit of their bargain (*i.e.*, they did not receive the data security and management practices that they paid for) and were damaged as a result.

86.     As a result of Defendants' conduct, Plaintiff and the Overpayment Class suffered actual damages in an amount equal to the difference in value of the secure healthcare they paid for and the insecure healthcare they received.

87.     As a further result of Defendants' conduct, Plaintiff and the Identity Theft Class have suffered actual identity theft. Plaintiff and the Identity Theft Class suffered and will continue to suffer actual damages including, but not limited to, expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; and increased risk of future harm.

88.     Further, Plaintiff and the Identity Theft Class have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(in the alternative to Breach of Express Contract)**
**(On Behalf of Plaintiff and the Classes)**

89.     Plaintiff incorporates the foregoing allegations as if fully set forth herein, excluding paragraphs 73 to 88.

90.     In order to benefit from Defendants' services, Plaintiff and the Classes were required to disclose Sensitive Information to Defendants, including their names, contact information (addresses, phone and fax numbers and email addresses), Social Security numbers, dates of birth, and extremely sensitive medical information.

91.     By providing that Sensitive Information, and upon Defendants' acceptance of such information, Plaintiff and the Classes, on the one hand, and Defendants, on the other hand, entered into implied contracts whereby Defendants were obligated to take reasonable steps to secure and safeguard that information.

92.     A meeting of the minds occurred, as Plaintiff and the Classes agreed to, among other things, provide their Sensitive Information and to pay Defendants in exchange for Defendants' agreement to, among other things, provide medical care and take reasonable steps to protect Plaintiff's and the Classes' Sensitive Information. For their part, Defendants acknowledged (through, for example, Aventura Hospital's patient agreements and privacy policies) that—by accepting Plaintiff's and the Classes' Sensitive Information and payments—they were required to

24

provide medical care and take reasonable steps to protect Plaintiff's and the Classes' Sensitive Information.

93.     Plaintiff and the Classes fully performed their obligations under the contracts. Without such implied contracts, Plaintiff and the Classes would neither have provided their Sensitive Information to Defendants nor paid for any services that required the provision of such Sensitive Information.

94.     As described herein, Defendants did not take reasonable steps to safeguard Plaintiff's and the Classes' Sensitive Information.

95.     Because Defendants allowed unauthorized access to Plaintiff's and the Classes' Sensitive Information and failed to take reasonable steps to safeguard their Sensitive Information, Defendants breached their implied contracts with Plaintiff and the Classes.

96.     The failure to meet these promises and obligations constitutes a breach of contract. In other words, Defendants breached the contracts by failing to implement reasonable security measures to protect Plaintiff's and the Classes' Sensitive Information as described herein. Defendants' failure to fulfill their data security and management obligations resulted in Plaintiff and the Overpayment Class not receiving services that they paid money for (*i.e.*, the provision of adequate data security and management practices, in addition to any medical services that were received).

97.     Stated otherwise, because Plaintiff and the Overpayment Class paid for privacy protections that they did not receive—even though such protections were a material part of their implied contracts with Defendants—Plaintiff and the Overpayment Class did not receive the full benefit of their bargain and were damaged as a result.

98.     As a result of Defendants' conduct, Plaintiff and the Overpayment Class suffered actual damages in an amount equal to the difference in value of the secure healthcare they paid for and the insecure healthcare they received.

99.     As a further result of Defendants' conduct, Plaintiff and the Identity Theft Class have suffered actual identity theft. Plaintiff and the Identity Theft Class suffered and will continue to suffer actual damages including, but not limited to, expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; and increased risk of future harm.

100.    Further, Plaintiff and the Identity Theft Class have suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## FOURTH CAUSE OF ACTION
### Restitution/Unjust Enrichment
### (in the alternative to Breach of Express and Implied Contracts)
### (On Behalf of Plaintiff and the Overpayment Class)

101.    Plaintiff incorporates the foregoing allegations as if fully set forth herein, excluding paragraphs 73–100.

102.    Plaintiff and the Overpayment Class members conferred a direct monetary benefit on Defendants in the form of healthcare service fees that were to be used by them, in part, to pay for the administrative costs of data management, protection, and security promised through their patient agreements and privacy policies.

103.    As described throughout this Complaint, Defendants did not protect or secure Plaintiff's and Overpayment Class members' Sensitive Information as promised and paid-for.

26

104.    Defendants received, retained, and benefited from Plaintiff's and other Overpayment Class members' service fees to their detriment.

105.    Defendants appreciate or have knowledge of their receipt, retention, and benefit from the service fees they received from or on behalf of Plaintiff and the Overpayment Class.

106.    Had Plaintiff and the Overpayment Class known of Defendants' data management and security flaws, they wouldn't have sought care from Defendants or would not have paid for Defendants' services.

107.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the Overpayment Class members, because Defendants knowingly failed to implement the data management and security measures that Plaintiff and the Overpayment Class paid for but did not receive.

108.    Further, as a result of Defendants' conduct, Plaintiff and the Overpayment Class members suffered actual damages and losses.

109.    Plaintiff and the Overpayment Class have no other adequate remedy at law.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, Plaintiff Barbara Brush, individually and on behalf of the Classes, respectfully requests that this Court enter an Order:

A.    Certifying this case as a class action on behalf of the Classes defined above, and appointing Plaintiff Brush as representative of the Classes, and appointing her counsel as Class Counsel;

B.    Declaring that Defendants' actions, as described above, constitute Negligence, Breach of Express Contract, and Breach of Implied Contract (in the alternative to Breach of

Express Contract), and resulted in Defendants' Unjust Enrichment (in the alternative to Breach of Express or Implied Contract) at the behest of Plaintiff and the Overpayment Class;

C.      Awarding injunctive and other equitable relief as is necessary to protect the interests of the Classes, including: (i) an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein, and (ii) requiring Defendants to protect all data collected through the course of their business in accordance with HIPAA, Fla. Stat. Ann. § 395.3025(4), and industry standards;

D.      Awarding damages to Plaintiff and the Classes in an amount to be determined at trial;

E.      Awarding restitution to Plaintiff and the Classes in an amount to be determined at trial;

F.      Awarding Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiff and the Classes pre and post-judgment interest to the maximum extent allowable by law; and

H.      Awarding such other and further legal or equitable relief as equity and justice may require.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: April 18, 2016                    Respectfully submitted,

*/s/ Steven R. Jaffe*
Steven R. Jaffe (Fla. Bar No. 390770)
E-mail: steve@pathtojustice.com
Mark S. Fistos (Fla. Bar No. 909191)
E-mail: mark@pathtojustice.com
Seth M. Lehrman (Fla. Bar No. 132896)
E-mail: seth@pathtojustice.com
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 N. Andrews Ave., Suite 2
Fort Lauderdale, Florida 33301
Telephone: (954) 524-2820
Facsimile: (954) 524-2822

Ari J. Scharg*
E-mail: ascharg@edelson.com
Benjamin S. Thomassen*
E-mail: bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

Scott D. Owens (Fla. Bar No. 597651)
E-mail: scott@scottdowens.com
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Suite 235
Hollywood, Florida 33019
Telephone: (954) 589-0588
Facsimile: (954) 337-0666

Bret L. Lusskin (Fla. Bar No. 28069)
E-mail: blusskin@lusskinlaw.com
BRET LUSSKIN, P.A.
20803 Biscayne Blvd., Suite 302
Aventura, FL 33180
Telephone: (954) 454-5841
Facsimile: (954) 454-5844

*Admission *pro hac vice* to be sought.

*Counsel for Plaintiff*

29